UNITED STATED DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| METROPLEX PATHOLOGY ASSOCIATES and MIRACA LIFE SCIENCE, INC., <br><br> Plaintiffs, <br><br> v. <br><br> THOMAS HORN, M.D., LISA M. COHEN, M.D., and MGPO DERMATOPATHOLOGY ASSOCIATES, <br><br> Defendants. | Civil Action No.: 2012-11024-RWZ <br><br> **REDACTED** |

**DEFENDANTS' OPPOSITION TO PLAINTIFFS'
MOTION FOR PRELIMARY INJUNCTION**

Thomas F. Maffei (BBO # 313220)
*tmaffei@gtmllp.com*
Scott McConchie (BBO # 634127)
*sm@gtmllp.com*
GRIESINGER, TIGHE & MAFFEI, LLP
176 Federal Street
Boston, MA  02110
Tel:  617-542-9900 / Fax:  617-542-0900

Dated:   June 21, 2012

Armed with nothing more than vague allegations made primarily upon "information and belief" (allegations which are flatly contradicted by the affidavits submitted in support of this opposition), the plaintiffs seek an unprecedented injunction commanding MGPO Dermatopathology Associates (the "MGH Outreach Lab") to fire three of the plaintiffs' former employees (Dr. Lisa M. Cohen and two staff persons) and to enjoin the MGH Outreach Lab from employing Dr. Lisa Lerner (who has accepted a position but has not yet begun working).[1]  The plaintiffs seek this relief even though they admit (1) that the doctors were free to leave the plaintiffs' employ; (2) that the agreements covering Drs. Cohen and Lerner *specifically* say that "notwithstanding the above [restrictions]" they may be employed by another laboratory to "review and interpret slides" (which is all they are doing here); (3) that Dr. Thomas Horn has *no* non-competition agreement; (4) that the staff persons are under no restrictive covenants and joined the MGH Outreach Lab on their own initiative after responding to an advertisement; and (5) that Massachusetts law prohibits any attempt to restrict a physician's practice of medicine.

The plaintiffs seek to marshal support for their requested injunction by claiming, with no factual support whatsoever, that Drs. Cohen and Horn and the MGH Outreach Lab are misusing the plaintiffs' confidential information, disparaging the plaintiffs, and trying to persuade referring doctors (mostly dermatologists) to terminate their relationships with the plaintiffs.  As appears in the affidavits filed by the defendants, however, these allegations; they are based upon (erroneous) conjecture.  The plaintiffs' reasoning boils down to the following:  because Drs. Cohen, Lerner and Horn all took jobs with the MGH Outreach Lab, the doctors *must be* breaching their agreements.  But one fact does not prove the other.  The plaintiffs' real motive is

---

[1] In 1997, Dr. Cohen started Cohen Dermatopathology, P.C. ("Cohen Dermatopathology") and was later joined by Dr. Lerner and Dr. Horn.  In 2007, Caris Life Sciences ("Caris") purchased Cohen Dermatopathology. (For purposes of this opposition, Cohen Dermatopathology and Caris will be used interchangeably to refer to the defendant doctors' former employer.)  In November 2011, plaintiff Miraca Life Sciences purchased Caris.

transparently clear:  to disrupt and disable the MGH Outreach Lab so that it cannot compete with the plaintiffs' business.

Just as they lack evidence of any breach, the plaintiffs also have failed to demonstrate that they have suffered any loss of business as a result of any actions taken by its former employees.[2]  While the defendant doctors recognize that they are subject to non-solicitation provisions -- and state in their affidavits that they have complied with them -- nothing in the agreements prevents the MGH Outreach Lab from marketing its services and nothing prevents referring doctors from sending tissue samples to the MGH Outreach Lab due to the reputation of the defendant doctors, the reputation of the MGH Outreach Lab, or the reputation of MGH.

Lastly, the defendants have not "rebuffed" the plaintiffs.  See Plaintiffs' Mem., p. 1.  To the contrary, the MGH physicians involved in establishing the MGH Outreach Lab have been aware of the doctors' agreements with Cohen Dermatopathology and have been careful to ensure that those agreements are honored.[3]  And even though the Outreach Lab is not required to go beyond what the agreements legally require, MGH instructed its staff to remove Dr. Horn's picture from MGH Outreach Lab's marketing brochure and to delete all references to Caris in Drs. Cohen's and Horn's biographical information in its marketing brochure and on MGH's general website, where biographies of *all* of its physicians are listed.  Kimball Aff., ¶¶ 20-21.

On this record, an injunction clearly is not warranted.  There is no legal basis whatsoever to order termination of the doctors and staff, and there is no need for the requested "protection" against actions which are not even occurring.

---

[2] In seven months into Dr. Horn's twelve month non-solicitation provision, which expires in October 2012, less than five known referrers to Caris have even sent specimens to the MGH Outreach Lab.  See Affidavit of Thomas D. Horn ("Horn Aff."), ¶ 14.

[3] In fact, contrary to the statement in the plaintiffs' brief that they did not learn until May 2012 that Dr. Cohen had joined MGH, see Plaintiffs' Mem., p. 6, an executive from the plaintiffs called MGH in October 2011 and inquired about Dr. Cohen.  He was told in October 2011 that Dr. Cohen's only responsibility at the MGH Outreach Lab was to review and interpret slides.  See Affidavit of Alexa Boer Kimball ("Kimball Aff."), ¶ 16.

*Statement of Facts*[4]

### The Parties

Plaintiff Miraca Life Sciences, Inc. ("Miraca") is a for-profit clinical diagnostics and laboratory testing service provider.  It is a subsidiary of Miraca Holdings, Inc., a huge Japanese company whose publicly-available consolidated balance sheets show current assets of over a billion dollars.  See http://www.miraca-holdings.co.jp/eng.  It is alleged that Miraca is the sole shareholder of plaintiff Metroplex Pathology Associates ("Metroplex"), which the plaintiffs allege was assigned the employment contracts at issue in 2010.  Complaint, ¶¶ 10-11.

As noted, the MGH Outreach Lab is affiliated with MGH.  Drs. Horn, Lerner and Cohen, and two staff persons (Mirna Rodriguez and Patricia Reilly) work at the MGH outreach Lab; all of them used to work for Caris.

### The Doctors' Restrictive Covenants

Dr. Horn's agreement contains a narrow non-solicitation provision, prohibiting him from soliciting Caris clients, employees or vendors to "terminate" their relationship with Caris.  Dr. Horn's agreement contains no non-competition agreement.  See Dkt. 4-3, ¶ 10.4.

Dr. Cohen's and Dr. Lerner's agreements contain a non-competition provision, but it *expressly* permits them to work for a competitor on a salaried basis provided they only "review and interpret" slides.  They also are prohibited from soliciting Caris patients, clients, employees or vendors.  See Dkt. 4-1, ¶¶ 13.2-13.3.

### MGH's Decision to Open a Dermpath Lab

In 2008, long before the events relevant to this case, MGH decided to start a dermpath outreach program to serve dermatologists and other specialists outside the hospital who require

---

[4] The grounds for this opposition are more fully set forth in the affidavits of Drs. Horn and Kimball as well as in the affidavits of Lisa M. Cohen ("Cohen Aff."), Mirna Rodriguez ("Rodriguez Aff.") and Patricia Reilly ("Reilly Aff."), all of which are incorporated by reference herein.

high level tissue analysis as part of their treatment of patients.  Kimball Aff., ¶ 3.  MGH's idea was that such a lab would benefit from being part of an academic medical institution.  Id., ¶ 4.  While there are some dermatopathology outreach programs in academic medical institutions, most of them are part of for-profit companies, such as Miraca.  Id.

During the first two years of planning, physicians and businesspersons at MGH conducted an extensive investigation and review of all aspects of opening a dermpath outreach lab, including the market for a lab, the competitive landscape, the requirements to establish the lab and the financial aspects of the lab.  Id., ¶¶ 5-8.  As part of the process, MGH retained two consultants and spoke with numerous individuals, including the operator of a national outreach lab, to gain information on all aspects of opening and operating the lab.  Id., ¶¶ 5-8, 14.

### Launch of the MGH Outreach Lab and the Hiring of Drs. Horn and Cohen

By late 2011, MGH was ready to launch the lab.  In October 2011, MGH posted job ads on its website and, in November 2011, it began running advertisements in numerous professional publications, primarily for the Medical Director position.  It soon became generally known that MGH was starting a dermatopathology outreach lab.  Kimball Aff., ¶ 10.  Eleven physicians applied for the Medical Director position and six were brought to MGH for interviews.  MGH subsequently hired Dr. Horn to be the Outreach Lab's Medical Director.  Dr. Horn accepted his offer in June; his start date was October 31, 2011.  Id., ¶¶ 9-10.  Dr. Horn left Caris because of the environment at Caris and, in particular, the behavior of his supervisor, Dr. Richard Lash, who was difficult, intolerant of dissent, and a micromanager.  See Horn Aff., ¶ 10.

When Dr. Horn agreed to join MGH, Dr. Cohen already had left her position at Caris (due to her serious concern and dissatisfaction with how Caris was operating the lab).[5]  Dr.

---

[5] Dr. Cohen and Dr. Horn were extremely unhappy at Caris                **REDACTED**

Cohen took five months off and decided to return to work. She interviewed at six dermatopathology labs, including MGH. She accepted the MGH position and started work on November 1, 2011. Cohen Aff., ¶ 26.

Dr. Horn explained the restrictions in his agreement with Caris to the physicians at MGH involved in establishing the MGH Outreach lab and MGH agreed that he would not be involved in sales and marketing until after his restrictions expired in October 2012. See Kimball Aff., ¶¶ 17-19. Prior to her accepting the position at MGH, Dr. Cohen also disclosed that she was subject to restrictions under her agreements with Caris. Id., ¶ 15. She specifically stated that she could have no role in the operation, management or marketing of MGH's outreach lab and that her responsibilities had to be limited to reviewing and interpreting slides. MGH agreed to the limitation on her responsibilities until her restrictions expired in July 2013. In fact, this limitation is memorialized in Dr. Cohen's employment agreement with MGPO. Id.

#### Neither Dr. Cohen or Dr. Horn Have Breached Their Agreements

None of the former Caris physicians solicited the other to leave Caris. They made their own decisions to leave without any pressure or solicitation by anyone. See Cohen Aff., ¶ 14; Horn Aff., ¶ 13. They did share a common dislike for the manner in which Caris was operating the lab and for the poor work environment that existed there. Id.

Dr. Horn, as Medical Director, is involved in the management of the outreach lab business, but he has had no involvement in sales or marketing. Horn Aff., ¶ 15. In fact, MGH has instructed Mary Ellen Graves, the Account Manager at the MGH Outreach Lab responsible for making sales calls to dermatologists' offices, to discuss her interactions with any potential referring dermatologists with Dr. Kimball, and not Dr. Horn. Kimball Aff., ¶ 23. Likewise,

**REDACTED**

¶

MGH has instructed Dr. Horn not to discuss any Caris referring physicians with Ms. Graves and he has not done so.  Id., ¶ 19; Horn Aff., ¶ 15.  The source of the names of dermatologists on whom Ms. Graves is making sales calls is the membership list on the website for the American Society of Dermatologists.  Graves Aff., ¶ 8.  Further, MGH told Ms. Graves not to mention Caris during her sales calls and not to mention Dr. Cohen, although she has been told that she may identify both Drs. Cohen and Horn if asked which physicians read the slides at the MGH Outreach Lab.  Id., ¶ 7.

Finally, the two staff persons who have been hired were not solicited by either Dr. Cohen or Dr. Horn.  They were both unhappy at Caris and, on their own initiative, responded to job postings on the MGH website.  Reilly Aff., ¶¶ 2-4; Rodriguez Aff., ¶¶ 2-4.

*Argument*

A preliminary injunction is only warranted where a plaintiff "has established that (1) it has a substantial likelihood of success on the merits, (2) there exists, absent injunctive relief, a significant risk of irreparable harm, (3) the balance of hardship tilts in its favor, and (4) granting the injunction will not negatively affect the public interest." FLEXcon Co. v. McSherry, 123 F. Supp. 2d 42, 43 (D. Mass. 2000).  The plaintiffs cannot carry their heavy burden.  Their papers are devoid of supporting "facts" and are simply wrong on the law.[6]

## I.    THE PLAINTIFFS ARE NOT LIKELY TO SUCCEED ON THE MERITS.

The plaintiffs make much of the fact that Caris paid Drs. Cohen and Lerner a substantial amount of money for their practice and that they need an injunction to protect "their investment." Presumably, the restrictions they insisted upon when Drs. Cohen and Lerner sold their practice were intended to protect whatever interest they had.  Those restrictions have not been violated,

---

[6] The plaintiffs' supporting affidavits are conspicuously vague and littered with hearsay.  "[W]hen the primary evidence introduced is an ***affidavit made on information and belief*** rather than on personal knowledge, it generally ***is considered insufficient to support a motion for preliminary injunction***."  Wright, Miller & Kane, Federal Practice and Procedure: Civil 2d § 2949 at p. 218 (2d ed. 1995) (emphasis added).

nor have Dr. Horn's.  This case is the plaintiffs' *ex post facto* attempt to get more protection than the agreements provide and more protection than the law permits.

> **A.      Dr. Cohen's and Dr. Lerner's Agreements Expressly Permitted Them to Resign from Cohen Dermatopathology and Take Positions with MGH.**

The plaintiffs seek to enjoin Dr. Cohen from continuing to work at the MGH Outreach Lab and to prevent Dr. Lerner from starting to work there.  See Dkt. 2-1 (Proposed Order), ¶¶ (b) and (c).[7]  In so doing, however, the plaintiffs completely ignore the relevant language of their employment agreements, which explicitly permit Drs. Cohen and Lerner to work for another lab, even one that competes with the plaintiffs:

> Physician covenants and agrees that she shall not during the Period, directly or indirectly, take any action that results or may reasonably be expected to result in owning any interest in, leasing, operating, managing, extending credit to, or otherwise participating in the business (including, without limitation, as a medical director, contractor or consultant) of a Competitor in the Restricted Area.  **Notwithstanding the foregoing, … the Physician shall <u>not</u> be prohibited from being employed on a salaried basis to review and interpret slides without any other duties or responsibilities of any nature or kind.**

Dkt. 4-1, ¶ 13.2 (emphasis added).

Quite clearly, *nothing* in their employment agreements prohibited Dr. Cohen or Dr. Lerner from leaving Caris and working at a competitor on a salaried basis to review and interpret slides.  Id.  And that, of course, is precisely what Dr. Cohen has done (and what Dr. Lerner will do).  See Kimball Aff., ¶ 15; Cohen Aff., ¶¶ 25-26.  In fact, their employment agreements with MGPO expressly limit their responsibilities to reviewing and interpreting slides.  See Kimball Aff., ¶¶ 15, 27.  Miraca's own medical director, who called MGH to confirm that Dr. Cohen's responsibilities were limited, was advised in October 2011 of this limitation.  Id., ¶ 16.

The plaintiffs do not allege that Dr. Cohen has any other role at the MGH Outreach Lab,

---

[7] Dr. Horn did not have a non-competition clause in his agreement, and the plaintiffs do not argue that he cannot work for the MGH Outreach Lab.

because she does not.  Instead, the plaintiffs make vague and unsupported allegations that Dr.

Cohen "conspired" with Dr. Horn and the MGH Outreach Lab.  They allege that "Horn and

Cohen, together with MGD, opened a new dermatopathology practice," Plaintiff's Mem.,, p. 6,

and that "the Defendants have combined to establish a direct competitor of the Company."  Id. at

9.  Plaintiffs' speculation and innuendo misses the mark.  MGH started planning to open the

outreach lab in 2008, long before Drs. Cohen and Horn ever applied for positions at MGH.

Kimball Aff., ¶ 3; Horn Aff., ¶ 14; Cohen Aff., ¶ 26.  Further, Dr. Cohen left Caris in March

2011, while Dr. Horn was still working there.  Thus, neither physician "opened" or "established"

the MGH Outreach Lab; they simply work there.

**B.      The Relief the Plaintiffs Seek Is Barred By Mass. G.L. c. 112, §12X.**

As noted above, Dr. Cohen's and Dr. Lerner's employment agreements expressly permit

them to work at another lab.[8]  But, even if their agreements did not have such carve outs,

Massachusetts law *requires* that the defendant doctors be permitted to practice medicine at the

MGH Outreach Lab or anywhere else.  *Any* restriction to the contrary is expressly prohibited by

G.L. c. 112, § 12X, which provides as follows:

> Any contract or agreement which creates or establishes the terms
> of a partnership, employment, or any other form of professional
> relationship with a physician registered to practice medicine
> pursuant to section two, which includes **any restriction of the
> right of such physician to practice medicine in any geographic
> area for any period of time after the termination** of such
> partnership, employment or professional relationship **shall be void
> and unenforceable with respect to said restriction**; provided,
> however, that nothing herein shall render void or unenforceable the
> remaining provisions of any such contract or agreement.

Mass. G.L. c. 112, § 12X (emphasis added).

Notwithstanding the unambiguous language of the statute, the plaintiffs purport to

---

[8] Indeed, the ability to work elsewhere was included in the agreement at Dr. Cohen's insistence.  When Dr. Cohen signed the agreement, she was 44 years old.  See Cohen Aff., ¶¶ 1, 9.

educate the Court on the "meaning and reach" of the statute.  They suggest that because the Supreme Judicial Court has noted that the statute recognizes "the strong public interest in allowing patients to consult the physician of their choice," see Plaintiffs' Mem., p. 14 (citing Falmouth Ob-Gyn Assocs., Inc. v. Abisla, 417 Mass. 176, 182 (1994)), the statute does not apply because *these* physicians work in a lab, analyzing biopsies and tissue slides and do not deal directly with patients.  See Plaintiff's Mem., p. 15 (arguing Dr. Cohen does not "deal directly with patients in the course of her work").

The plaintiffs' argument is seriously flawed.  First, it ignores the plain language of the statute, which is not limited to restrictions that interfere with a "direct" doctor-patient relationship.  The statute bars "any restriction … to practice medicine."  Massachusetts regulations define the "practice of medicine."  See 243 CMR 2.01.  Not surprisingly, it is *not* limited to doctors "who deal directly with patients."  Indeed, it expressly includes "telemedicine," which is defined "as the provision of services to a patient by a physician from a distance by electronic communication in order to improve patient care, treatment or services." Id.[9]  Finally, it is beyond reason to say that a patient whose biopsy is sent to a dermatopathologist for analysis is not a patient of that doctor or that the doctor does not regard the person whose tissue he or she is analyzing as his or her patient.  In short, there can be no serious dispute that Drs. Cohen, Horn and Lerner are engaged in the practice of medicine and G.L. c. 112, § 12X therefore applies to their agreements.

Second, in arguing that Dr. Cohen and Dr. Lerner are simply technicians in a laboratory who are not rendering care to patients, the plaintiffs avoid mention that the employment

---

[9] The "practice of medicine" also includes the following definition:  "A person who holds himself or herself out to the public as a physician or surgeon, or with the initials 'M.D.' or 'D.O.' in connection with his or her name, and who also assumes responsibility for another person's physical or mental well being, is engaged in the practice of medicine."  243 CMR 2.01(emphasis in original).  Of course, to even provide medical services to patients, Drs. Horn, Cohen and Lerner must be "registered to practice medicine", too.  See G.L. c. 112, § 12X.

agreements on which they purport to rely refer specifically to the services rendered by the doctors "to patients whose specimens are sent to the Laboratory for evaluation…." See Dkt. 4-1, p. 1 of 28. And as evidenced by the Attachment to the agreement, which delineated the "Clinical and Administrative Services" to be performed by Dr. Cohen, she was required to "[p]articipate in the provision of pathology service for Patients of Practice", "[p]rovide clinical services regarding all patients", and "[p]rovide the Services in accordance with the expressed preference of Patients…." See Dkt. 4-1, p. 23 of 28.[10]

Third, Miraca's own website prominently proclaims the following:

> **Serving more than 3,000 patients each day**, Miraca Life Sciences is a leader in providing academic-caliber pathology services in the fields of dermatopathology, GI pathology, hematopathology and urologic pathology.

http://www.miracalifesciences.com/ (emphasis added). This, of course, reflects the reality that although they receive referrals from dermatologists, dermatopathologists render medical services to the patients from whom the biopsies and samples are actually taken.[11]

Finally, the plaintiffs' attempt to explain away the statute cannot overcome the case law applying it. Indeed, the plaintiffs have not identified one case where the statute has been interpreted as narrowly as they suggest it should be. The relatively few cases which address the statute apply it expansively, which, of course, is consistent with the plain language of the statute. See, e.g., Falmouth Ob-Gyn Assocs., 417 Mass. at 182 (plaintiff practice sought to enforce a liquidated damages provision; SJC declared the provision, which was "designed to protect" the plaintiff's "patient base", void under the statute).

The breadth of the statute is further evidenced by its application to non-solicitation

---

[10] The agreement contains numerous other repeated references to "patients." See, e.g., Dkt. 4-1, ¶¶ 8.1, 8.4.3, 8.11, 9, 10, 13.2, 13.3.

[11] Indeed, if a dermatopathologist were to make a mistake, the patient -- and not the referring dermatologist -- would have a claim against the dermatopathologist.

clauses, which Massachusetts lower courts have deemed unenforceable. In Ell Pond Med.

Assocs. v. Lipski, 8 Mass. L. Rep. 138, 1998 Mass. Super. LEXIS 292 (Mass. Super. Ct. Jan. 29,

1998), for example, the Court stated as follows:

> **The statute seeks** to empower patients to follow physicians of
> their choice, and **not to inhibit physicians' ability to practice. In**
> **today's world, the ability to practice includes the ability to**
> **solicit business**, and certainly the ability to obtain a patient's
> medical records.

Id. at *3 (emphasis added); see also Cape Cod ASC, LLC v. Bentivegna, 2010 Mass. Super.

LEXIS 167, *4-5 (Mass. Super. Ct. July 1, 2010) (Rufo, J.) (noting that in prior proceeding both

non-compete and non-solicitation provision, which barred solicitation of employees of medical

practice, had been struck under the statute.)[12] There can be no serious question that the statute

applies to the agreements here and renders unenforceable "any restriction of the right of such

physician to practice medicine."

### C.      Neither Dr. Cohen nor Dr. Horn Have Solicited Caris Referring Doctors.

The plaintiffs allege that both Dr. Horn and Dr. Cohen have violated the non-solicitation

provisions in their agreements. Plaintiffs allege Dr. Horn is in violation because "MGD, with

Horn's knowledge and consent, is using Horn in its marketing and solicitations to existing

Company clients." Plaintiffs' Mem., p. 10. Dr. Cohen is faulted for "allowing MGD to use her

in their marketing and solicitations to Company clients." Id. at 11.

As noted above, Massachusetts courts have struck down non-solicitation provisions

directed to physicians. But even if not struck as a matter of law, neither Dr. Horn nor Dr. Cohen

has violated his or her respective restriction. Dr. Horn's restriction, in relevant part, is as

follows:

---

[12] The plaintiffs admit that Dr. Horn's non-solicitation provision is limited to one that prohibits the solicitation of referring doctors to "terminate" their relationship with Caris. Notwithstanding the narrowness of the provision, MGH has told Dr. Horn that he should have no role in soliciting referring physicians until after October 2012, when his restriction expires. Kimball Aff.,¶ 19.

- 11 -

> Upon termination of this Agreement and for one (1) year thereafter, Physician agrees that he will not (i) attempt to persuade, induce, solicit, encourage or otherwise suggest that employees of, vendors with, or referrers to the Corporation terminate their relationship with the Corporation ….

Dkt. 4-3, ¶ 10.4.  Dr. Cohen's restriction, in relevant part, is as follows:

> Physician further agrees that she shall not, during the Period, directly or indirectly, take any action that constitutes, results or may reasonably be expected to result in (a) soliciting, diverting or interfering with any relationship that Practice has with any Patients or customers of Practice;

Dkt. 4-1, ¶ 13.3.

As reflected in the accompanying affidavits, Dr. Horn and Dr. Cohen do absolutely no soliciting.  See Kimball Aff., ¶ 19; Horn Aff., ¶ 15; Cohen Aff., ¶ 25.  Ms. Graves, who is the person at MGH Outreach Lab that make sales calls, does not report to or interact with Dr. Horn or Dr. Cohen about marketing.  Kimball Aff., ¶ 22; Graves Aff., ¶ 7.  Ms. Graves assembled her "prospects list" from a website, and has not been "fed" Caris clients by Dr. Horn and Dr. Cohen to solicit.  Graves Aff., ¶ 8.

Because Dr. Horn and Dr. Cohen are not involved in marketing, the plaintiffs are left to make the vague complaint that the MGH Outreach Lab is "using Horn" and "using [Cohen]" in "marketing and solicitations" to Caris clients.  Plaintiffs' Mem., pp. 10-11.  That use, of course, is limited to (1) Dr. Horn's photograph and past affiliation with Caris being used in a brochure,[13] and (2) Dr. Horn and Dr. Cohen being listed on MGH's website, where all physicians are listed.

For a number of reasons, the plaintiffs' criticisms do not support a cause of action, let alone justify a preliminary injunction.  First, identifying Dr. Horn as the Medical Director of the MGH Outreach Lab (and mentioning Dr. Cohen when asked who reads slides) is not "solicitation."  Contrary to what plaintiffs' imply, not all contact is equivalent to "solicitation."

---

[13] Dr. Cohen's name never has appeared on the marketing brochure.  Although not necessary, MGH is printing new brochures without Dr. Horn's photograph or his prior affiliation with Caris.  Kimball Aff., ¶ 20.

See BNY Mellon, N.A. v. Schauer, 27 Mass. L. Rep. 329, 2010 Mass. Super. LEXIS 209, *33 (Mass. Super. Ct. May 14, 2010) (Hinkle, J.) ("Nonsolicitation does not mean no contact.") "'Solicitation' is defined as the act or an instance of requesting or seeking to obtain something." Oceanair, Inc. v. Katzman, 14 Mass. L. Rep. 414, 2002 Mass. Super. LEXIS 60, *17 (Mass. Super. Ct. Jan. 20, 2002) (van Gestel, J.) (citing Black's Law Dictionary, (7th ed.), p. 1398) ; see also UBS Paine Webber Inc. v. Dowd, 2001 Mass. Super. LEXIS 576, *7 (Mass. Super. Ct. Nov. 29, 2001) (van Gestel, J) ("wedding-style" announcement informing customers of new contact information did not amount to a solicitation).[14]

Of course, the plaintiffs' real goal is to bootstrap a non-solicitation provision on Dr. Horn and Dr. Cohen into an absolute bar preventing the MGH Outreach Lab from serving dermatologists who may have used Cohen Dermatopathology in the past but who now want to use the MGH Outreach Lab in caring for their patients. Even if such a restriction found any support in the text of their agreements (and they do not), it would be void as a matter of law.

> Mazonson's **clients have the freedom of choice** to follow and do business with Greenbaum at his new employer, Risk Strategies. The restriction in the agreement which prohibits Greenbaum from providing services or selling insurance to any Mazonson customer, even if there has been no solicitation by Greenbaum violates public policy and is unenforceable. … **The restriction represents a naked and unreasonable restraint on trade and commerce.**

Mazonson, Inc. v. Greenbaum, 2007 Mass. Super. LEXIS 172, *7-8 (Mass. Super. Ct. May 4, 2007) (Murtagh, J.) (emphasis added; citation omitted). Stated differently, "ordinary competition is not protectable by an injunction." Tyler Techs., Inc. v. Reidy, 2006 Mass. Super. LEXIS 594, *12 (Mass. Super. Ct. Oct. 30, 2006) (van Gestel, J.) ("Further, the clients or

---

[14] The instant case actually presents an even more compelling case than those cases where announcements were deemed proper, because in those cases the defendants used contact information gained from their prior employment to initiate the mailings. In the instant case, Ms. Graves "cold calls" dermatologists and does not even know which offices send samples to Caris. See Graves Aff., ¶ 12. There simply is no targeted solicitation of Caris customers (nor have plaintiffs presented any proof of any such solicitation). To the extent that the plaintiffs are claiming that the defendant doctors' "reputations" may attract business, that is not solicitation; it is customer choice.

customers are entitled to complete freedom in choosing the entity they deem appropriate for their

pension administration needs.  In the absence of some clearly demonstrated interference with that

choice, this Court will not interfere therewith.").

Second, the plaintiffs have presented no proof that it lost any clients to the MGH

Outreach Lab.  The only allegation is the following, which is remarkable for its absolute lack of

specificity:

> Since MGD hired Cohen and Horn, and began using their
> reputations, employment status and confidential information to its
> advantage, the Company has lost and will continue to lose business
> as a direct result of MGD's actions.

Dkt. 5 (Calabro Aff.), ¶ 23.  Such hopelessly vague allegations are not sufficient to demonstrate a

"likelihood of success on the merits."  See, e.g., Mazonson, 2007 Mass. Super. LEXIS 172 at *7

(denying preliminary injunction where plaintiff had "not presented any affidavits from any

existing or prospective customers to support its contentions" that it lost clients because the

defendant solicited them); BNY Mellon, 27 Mass. L. Rep. 329, 2010 Mass. Super. LEXIS 209,

*33 (Mass. Super. Ct. 2010) (Hinkle, J.) ("Absent from the record, however, is competent

evidence establishing overt solicitation.").  In this case, the MGH Outreach lab has reviewed

tissue specimens from less than five dermatologists who also have used Caris,

………**REDACTED**…………………  See Horn Aff., ¶ 14.  The latter example points out the

policy behind the Massachusetts statute that ensures that every patient is to be guaranteed

freedom in choice of physician.

Finally, as noted, Dr. Horn's non-solicitation provision is very narrowly drawn.  It

prohibits him from persuading referring doctors to "terminate their relationship with the

[plaintiffs]."  See Dkt. 4-3, ¶ 10.4 (emphasis added).[15]  The plaintiffs, of course, proffer no

---

[15] The plaintiffs attempt to work around the "terminate" limitation by arguing that the "very purpose of these solicitations is to induce Company clients to leave Cohen Dermatopathology and send their business to MGD

evidence that Dr. Horn requested any doctor to "terminate" his or her relationship with Caris.  (In fact, they do not allege Dr. Horn personally did any solicitation at all.)  Moreover, Ms. Graves, who is not even subject to the restriction, testified that, when a prospect identifies that it is using Caris, she does not suggest that it should terminate its relationship with Caris; instead, she focuses on the positives of MGH.  Graves Aff., ¶ 13.

**D.      Dr. Horn Has Not Raided Plaintiffs' Employees.**

The plaintiffs do not contend that Dr. Cohen solicited any of plaintiffs' employees, but argue that "[Dr. Horn] and MGD have hired at least four Company employees who qualify under that [non-solicitation] restriction: Cohen, Lerner, Riley [sic] and Rodriguez."  Plaintiffs' Mem., p. 10.  The plaintiffs have submitted no evidence that Dr. Horn solicited these individuals; they simply make that assumption because he is the MGH Outreach Lab's Medical Director.[16]  See Dkt. 4 (Azure Aff.), ¶ 29.  The individuals deny that they were solicited or encouraged to leave Caris.  Reilly Aff., ¶ 3; Rodriguez Aff., ¶ 3.  They each applied when they saw the MGH job posting.  Reilly Aff., ¶ 3; Rodriguez Aff., ¶ 4.  Further, they were hired by MGH and not by Dr. Horn.  Reilly Aff., ¶ 1; Rodriguez Aff., ¶ 1.

**E.      The Plaintiffs Have Offered No Evidence of Misuse of Confidential Information or Disparagement.**

There is not one fact in admissible form in the plaintiffs' papers that supports the allegation that there has been misuse of confidential information or disparagement.  The plaintiffs' affidavits do not allege any actual misuse of "confidential information"; they merely

and Horn."  Plaintiffs' Mem., p. 10.  Not so.  Ms. Graves testified that many offices use more than one dermpath lab. Graves Aff., ¶ 12.  (And, of course, Ms. Graves' solicitations are not even covered by Dr. Horn's agreement.)

[16] In addition, in their brief, plaintiffs state that they are "*aware of Horn and MGD* making at least one job offer to a Company employee, which required the Company to increase its compensation package in order to retain that employee."  Plaintiffs' Mem., p. 10 (emphasis added).  Ms. Azure's affidavit, which is the support for the assertion, says something different:  "*Upon information and belief, MGD* also extended an offer of employment to another Company employee…."  Dkt. 4, ¶ 30 (emphasis added).  Thus, in the brief, the plaintiffs argue Dr. Horn had some role, but the affidavit does not.  Remarkably, but reflective of the plaintiffs' complete lack of evidence to support their motion, the plaintiffs do not identify this one employee, let alone submit an affidavit from her about any solicitation.

complain that the MGH Outreach Lab is "directly soliciting the Company's network of referring physicians." Dkt. 5 (Calabro Aff.), ¶ 21.[17]  Ms. Graves, however, did not assemble her prospect list from information conveyed to her by Dr. Horn or Dr. Cohen; she compiled it from a publicly-available website. Graves Aff., ¶ 8.  Moreover, "direct solicitation" *by Ms. Graves* does not run afoul of any agreement. The presence of Dr. Horn and Dr. Cohen does not prevent the MGH Outreach Lab from marketing itself.

The disparagement allegation is similarly infirm. The plaintiffs allege only that "[u]pon information and belief, during its direct solicitation of the Company's clients, MGD's sales representative has stated they are specifically targeting the Company's clients because MGH has heard that there are many 'issues' with the Company's lab and that a number of the Company's clients are unhappy with it since Cohen and Horn left." Dkt. 5 (Calabro Aff.), ¶ 21.  Notably, the plaintiffs fail to submit an affidavit from any of their clients. In any event, Ms. Graves denies that she has ever said anything negative about any competitor. Graves Aff., ¶ 12.

## F.    Even if the Restrictive Covenants Were Implicated (and They Are Not), The Plaintiffs Have No Right to Enforce Them.

The plaintiffs allege that Metroplex is the assignee of the Cohen and Horn employment agreements. See Complaint, ¶¶ 10, 11, 18, 26.[18]  They baldly assert that, for both Cohen and Horn, "the Employment Contract is therefore a valid contract as between [the doctor] and the Company." Id., ¶¶ 18, 26.[19]  Even though the plaintiffs allege that Metroplex is the assignee, in a May 17, 2012 "cease and desist" letter to Cohen, *Miraca* purported to enforce Cohen's

---

[17] In their brief, the plaintiffs argue that "Horn and/or Cohen knowingly and intentionally misappropriated the Company's confidential information about its clients' identities and contacts and provided them to MGD." Plaintiffs' Mem., p. 18.  There is no support for this assertion in the plaintiffs' affidavits, however. Cf. Dkt. 5 (Azure Aff.), ¶¶ 21-23.  Moreover, this unfounded accusation is flatly contradicted by Dr. Horn, Dr. Cohen, Dr. Kimball, and Ms. Graves. Horn Aff., ¶ 15; Cohen Aff., ¶ 26; Kimball Aff., ¶ 18; Graves Aff., ¶ 8.

[18] Miraca is Metroplex's sole shareholder. Complaint, ¶ 11.  According to the Massachusetts secretary of state filings, Metroplex is *not* registered to do business in Massachusetts, but Miraca is.

[19] The "Company" is defined as Metroplex and Miraca. See Complaint, Preamble.

- 16 -

obligations to Cohen Dermatopathology as "successor in interest to Caris Diagnostics, Inc."  See

Cohen Affidavit, Ex. B, p. 1.

There is a substantial question whether the plaintiffs may seek to enforce these

agreements because, on this record, the purported assignment to Metroplex (and Miraca, which is

Metroplex's sole shareholder) in each case was ineffective.  Cohen's agreement provided, in

relevant part, as follows:

> Physician agrees that this Agreement may be freely assigned by Practice
> upon notice to Physician … ***so long as the assignee agrees to be bound by
> all of the terms and conditions of this Agreement and accepts the
> Agreement in writing.***

Dkt. 4-1, ¶ 16.3 (emphasis added).

Horn's agreement was a bit different, providing in relevant part as follows:

> This Agreement shall extend to and be binding upon and inure to the
> benefit of the parties hereto, their respective successors and assigns;
> provided, however, unless otherwise provided herein, ***that none of the
> parties shall have the right to assign this Agreement***, except to a
> subsidiary or parent corporation, or any entity controlled by a subsidiary
> or parent corporation, ***without the prior written consent of the other
> parties***.

Dkt. 4-3, ¶ 14.4 (emphasis added).

The plaintiffs allege the assignment for each contract occurred "on or about January 1,

2010."  Complaint, ¶¶ 18, 26.  The plaintiffs do not allege, however, that (a) Metroplex or

Miraca ever "accepted" Cohen's employment agreement in writing, or (b) Horn gave his "prior

written consent" for his agreement to be assigned.  (And neither Cohen nor Horn are aware of

such conditions being followed.)  Accordingly, neither Metroplex nor Miraca has standing to

even attempt to enforce the restrictive covenants.[20]

---

[20] Although Massachusetts appellate courts have not addressed the issue, lower courts have required consent for an assignment to be effective.  See, e.g., Next Generation Vending v. Bruno, 2008 Mass. Super. LEXIS 348, *8 (Mass. Super. Ct. May 20, 2008) (Quinlan, J.) ("non-compete clauses are not assignable unless specifically assented to by the employee"); Securitas Sec. Servs. USA, Inc. v. Jenkins, 16 Mass. L. Rep. 486, 2003 Mass. Super. LEXIS 200, at *14-15 (Mass. Super. Ct. July 18, 2003) (van Gestel, J.) (preliminary injunction denied where

G.    **The Plaintiffs Have Not Shown A Likelihood of Success on their Claims Against the MGH Outreach Lab.**

As demonstrated in the defendants' affidavits, MGH has been scrupulous in ensuring adherence to Dr. Horn's and Dr. Cohen's agreements.  The plaintiffs have not demonstrated that those agreements have been breached or that MGH interfered with the agreements, let alone that the plaintiffs have suffered any damages.  Accordingly, the plaintiffs' tortious interference and Chapter 93A claims against the MGH Outreach Lab have no likelihood of success.

## II.    THE PLAINTIFFS HAVE NOT IDENTIFIED HARM, LET ALONE IRREPARABLE HARM.

The plaintiffs' affidavits do not identify one referring physician who has terminated Caris because of something the defendants did that violated the agreements at issue.  They simply allege "the Company has lost and will continue to lose business as a direct result of MGD's actions."  Dkt. 5, ¶ 23.  The plaintiffs' vague assertions do not carry their burden to show irreparable harm.  See, e.g., Optical Publishing Co., Inc. v. McCue, 1984 U.S. Dist. LEXIS 17989, No. 83-0474 (D. Mass. 1984) (no showing of irreparable harm where plaintiff produced no evidence that it had lost advertisers since defendant began work for a competitor).

Moreover, the existence of *irreparable* harm is belied by how long the plaintiffs took to act.  The plaintiffs state that "[i]n mid-May, the Company learned that Horn and Cohen, together with MGD, opened a new dermatopathology practice, designed to be a direct competitor."  Plaintiffs' Mem., p. 6.  This statement is false.  The plaintiffs knew about the MGH Outreach Lab as far back as October 5, 2011, when one of its executives called Dr. Kimball to confirm that

---

plaintiff could not show likelihood of success because non-compete was not assignable without express consent; "Certainly Jenkins could not assign his contract with Pinkerton's to serve as its Region President for New England without Pinkerton's assent. For similar reasons Pinkerton's could not assign Jenkins's employment agreement to another corporate entity without Jenkins's assent."); Chiswick, Inc. v. Constas, 18 Mass. L. Rep. 104, 2004 Mass. Super. LEXIS 272, *5 (Mass. Super. Ct. July 17, 2004) (Kane, J.) (where defendant never consented to assignment, and where "specific issue has not been addressed by any Massachusetts appellate court," court finds that the plaintiff has failed to demonstrate a likelihood of success).

Dr. Cohen would only be reviewing and interpreting slides.  See Kimball Aff., ¶ 16.

Finally, even if the plaintiffs could identify some "irreparable harm", which they cannot, "traditional economic damages can be remedied by compensatory awards, and thus do not rise to the level of being irreparable."  Vaqueria Tres Monjitas, Inc. v. Irizarry, 587 F.3d 464, 485 (1st Cir. 2009); Ikon Office Solutions, Inc. v. Belanger, 59 F. Supp. 2d 125, 132 (D. Mass. 1999).[21]

## III.   THE BALANCE OF HARDSHIPS FAVORS THE DEFENDANTS.

The plaintiffs seek to put three individuals out of work (including two administrative employees not subject to any agreements at all) and prevent another from joining the MGH Outreach Lab.  Their goal is obvious: to cripple the MGH Outreach Lab, one of the relatively few dermatopathology outreach programs in an academic medical institution.

In contrast, the alleged (and completely unsupported) harm to the plaintiffs is the loss of some referring doctors.  In such a situation, the balance of hardships tilts decidedly in favor of the defendants.  See, e.g., Edwards v. Athena Capital Advisors, Inc., 23 Mass. L. Rep. 155, 2007 Mass. Super. LEXIS 378, *9-10 (Mass. Super. Ct. Aug. 9, 2007) (McDonald, J.) ("Edwards' interest in earning a living outweighs Athena's speculative interest in protecting its investment in training its employees, or in avoiding adverse competition.") (citing Woolley's Laundry v. Silva, 304 Mass. 383, 387, 23 N.E.2d 899 (1939) ("the public and the individual have an interest in every person carrying on his trade or occupation freely. Interference with individual liberty of trade, if there is nothing more. is contrary to public policy ….")).

## IV.   THE PUBLIC INTEREST WOULD BE NEGATIVELY AFFECTED BY AN INJUNCTION.

The plaintiffs argue that the "public interest favors *fair* competition."  Plaintiffs' Mem., p. 20.  This statement is ironic given that the plaintiffs seek to restrain fair, ordinary competition

---

[21] To date, less than five known referrers to Caris have sent specimens to the MGH Outreach Lab, and they did not do so because of any breach by the defendants. See Horn Aff., ¶ 14.  Even if these referrals were the result of some bad acts by Dr. Horn or Cohen, which they are not, it can hardly be said that this is "irreparable harm."

with a preliminary injunction, even though they have adduced not a scintilla of evidence that the doctors have breached the restrictive covenants in their respective agreements.

That the public interest would *not* be served by an injunction is obvious.  First, the public interest in the freedom of doctors to practice medicine is codified in G.L. c. 112, § 12X.  The SJC has squarely rejected restrictive covenants "designed to protect" the "patient base" of medical practices.  Falmouth Ob-Gyn Assocs., 417 Mass. at 182.

Second, an injunction would limit referring doctors' options about where to send specimens.  That benefits no one but the plaintiffs.  The public has a keen interest in having more options, not less (especially where the number of dermatopathologists nationwide is relatively small).

Third, the public interest favors having an outreach lab affiliated with an academic institution, of which there are few.  The plaintiffs' proposed injunction aims at crippling its non-profit competitor.

Fourth, "[p]ublic policy favors an employee's right to move from job to job unencumbered by restrictions that are not narrowly tailored to protect an employer's legitimate interests."  Edwards, 2007 Mass. Super. LEXIS 378 at *6.  Where the doctors are not in breach of their agreements and the administrative personnel are not subject to any agreements, public policy is decidedly against interfering with their ability to earn a livelihood.

### Conclusion

For the foregoing reasons, the Plaintiff's Motion for Preliminary Injunction should be denied and this case should proceed to arbitration, as called for in the employment agreements at issue.

THOMAS HORN, M.D., LISA M. COHEN, M.D., and
MGPO DERMATOPATHOLOGY ASSOCIATES,

By their counsel,

/s/ Thomas F. Maffei
Thomas F. Maffei (BBO # 313220)
*tmaffei@gtmllp.com*
Scott McConchie (BBO # 634127)
*sm@gtmllp.com*
GRIESINGER, TIGHE & MAFFEI, LLP
176 Federal Street
Boston, MA  02110
Dated:   June 21, 2012                   Tel:  617-542-9900 / Fax:  617-542-0900


## Certificate of Service

I, Thomas F. Maffei, hereby certify that this document, as well as the affidavits filed in support of the defendants' opposition, filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) on June 21, 2012.  In addition, I hereby certify that plaintiffs' counsel will be sent, via email, copies of all unredacted papers.

*Thomas F. Maffei*
Thomas F. Maffei

- 21 -